HON. J. G. TALIAFERRO,
HON. R. K. HOWELL,
HON. W. G. WYLY,
HON. W. W. HOWE,
} *Associate Justices.*

---

No. 2255.—SUCCESSION OF CABALLERO (MRS. CONTE) *v.* THE EXECUTOR et al.

24 573
46 985
24 573
115 705
24 573
119 713

A marriage contracted in Spain between parties who had formerly lived together in a state of concubinage in Louisiana, but who removed to Spain to reside there permanently, had the effect of legitimizing the children born in Louisiana before the removal, and a will made by a man in this situation before the marriage in Spain, who after the marriage in Spain again moves to Louisiana with his wife and children thus legitimated to live, and he and his wife both die here, the legacies must be reduced to the disposable portion of the testator, because the marriage legitimizes the children, who become forced heirs, which revokes the will and limits its dispositions to the disposable portion, the same as if the children had been born in lawful wedlock posterior to its date.

The fact that the woman in this case was a person of color, who at the time of the marriage in Spain was by the laws of Louisiana prohibited from contracting a marriage with a white man, would not affect the marriage in Spain between the same parties, nor would it affect the legal consequences of the marriage, such as the legitimizing the offspring before the marriage, notwithstanding the prohibition in the Louisiana law. The marriage being good and valid by the laws of Spain, it was also valid here. If, therefore, the law of Louisiana has been subsequently changed, and the prohibitions to the marriage between a white person with a person of color has been removed, then such children so legitimized by the marriage in Spain can inherit the estates of their parents in Louisiana the same as other legitimate or legitimized children.

APPEAL from the Second District Court of New Orleans. *Duvigneaud,* J. *George L. Bright,* for Mrs. Conté, appellee. *J. Ad. Rozier & Son* and *Lea, Finney & Miller,* for executor et als.

TALIAFERRO, J. The plaintiff Mrs. Conté, claiming to be the sole heir of J. M. Caballero, sues to set aside his will, to annul certain legacies contained in it and to be put in possession of the estate. Her

claims are opposed by the universal legatee and by the particular legatees. They aver that the plaintiff is illegitimate, her parents never having been married legally. That being born of a colored woman she could not have been acknowledged or legitimated by marriage under the laws of Louisiana prior to her father's decease, and that she is consequently incapacitated to receive anything from the estate of Caballero by inheritance as an heir. This is met by the averment that the father and mother of the plaintiff were married in Havana, where the laws of Spain are in force, and that the Spanish laws determine the condition and rights of the parties resulting from their marriage.

The judgment of the court below was in favor of the plaintiff. The executor has appealed.

Caballero, a native of Spain, came to New Orleans in the year 1832, became a citizen of the United States and lived in New Orleans until the year 1856, when he returned to his native country, taking Havana in his way, where he remained a short time. During his residence in Louisiana he lived in intimacy with a colored woman, by whom, it seems, he had several children, the plaintiff in this case being the only one of them now living. She was born in February, 1840. Caballero made an olographic will, dated March 21, 1852, and ratified it in January, 1856. After making various legacies for charitable purposes he constituted Basualdo his universal legatee, and named him as executor. In March, 1856, Caballero left New Orleans for Cadiz, in Spain, and at Havana, in April following, he was married to Carolina Visinier, the plaintiff's mother. He proceeded to Spain, where he resided about three years, and then returned to New Orleans, where he died in the spring of the year 1866. Under this state of facts it is important to ascertain whether the removal of Caballero to Spain was made *animo manendi*, with the purpose of being permanently there; for if he was merely sojourning in Havana and Cadiz, and went there temporarily for the purpose of legitimating his daughter by the marriage with her mother, and with the purpose of evading the laws of Louisiana, which at that period presented an impediment to the accomplishment of his purpose, a grave doubt might arise as to the legal effect in Louisiana of a marriage so contracted. We think, however, the evidence warrants the conclusion that in going to Spain his purpose was to spend the remainder of his life in his native country. It is shown that on his return he made declarations to that effect in Cadiz, and these declarations are strongly corroborated by several facts which seem to go far to establish the truth of these declarations. He was a man of ample fortune. He sold his family tomb in New Orleans for a large price and carried with him the remains of his children and placed them in a tomb which he had built

in Cadiz at an expense of $25,000. He purchased· there a costly dwelling house, made expensive repairs upon it, and resided in it with his family. It is fully proved that such a marriage as the one between Caballero and Carolina Visinier, that took place at Havana, is legal by the laws of Spain. A judicial order was rendered by a competent judge legitimating the daughter, and upon that occasion the record of her birth and baptism in New Orleans was transcribed in the record of baptisms in Havana.

We understand the rule to be well settled that marriages valid by the laws of the country where they are entered into, are held valid in any other country to which the parties may remove, unless there exists, from reasons of public policy, in the country to which they remove, some impediment by the laws of that country, or that such marriages are in derogation of good morals. In such exceptional cases comity could not be invoked to recognize their validity. How stands the matter in regard to the rights of Mrs. Conté, the plaintiff in this case? Here we may notice that this person, after her parents removed from Louisiana to Spain, never returned to Louisiana to live, and that she is a subject of the government of Spain. At the time of her legitimation by the marriage of her parents, marriage between white persons and free persons of color was prohibited by our law. The Louisiana law would not have recognized as valid in Louisiana the marriage of Caballero in Havana. What was the consequence, then, upon his return to Louisiana? It resulted that there was in this State no community of acquets and gains between the parties to that marriage. Had there been children born to them in Louisiana after that marriage, they would have been by our law illegitimate. Thus far would our law have extended and had effect when Caballero returned to. Louisiana, but no further. Its edict, so far as it bore upon his marriage, was of local and limited effect. · It existed for a purpose local and special in this country. That purpose could not have been more effectually carried out by withholding from persons abroad, legitimate by the laws of the country where they lived, the right of inheriting property in this State. It could not and did not aim to affect elsewhere the validity of a marriage like that of the parents of the plaintiff. It was strictly personal to parties living in Louisiana who had anywhere contracted the kind of marriage not permitted by its policy, and did not, as in the plaintiff's case, affect the children of such parents legitimated in other countries and not incapacitated here on other grounds. The policy of this State had no broader extent, because there was no reason why it should have. *Cessante ratione cessat et ipsa lex* Accordingly we find that there was not, at the period we have referrence to, nor is there now, any law of Louisiana rendering Mrs. Conté incapable of inheriting in this State./

But conceding it to be true, as alleged, that by our law there existed an incapacity in the plaintiff to inherit, and that that incapacity was fixed at the opening of her father's succession, we should not regard it as fixed irrevocably. If the incapacity contended for existed, that condition was fixed relatively to the laws, the public policy and the general state of things then existing. It was not necessarily an irrevocable doom. It did not cut her off from benefits that might occur amid the ceaseless mutations of human affairs, from advantages that might arise in the future from a changed condition of law and public policy. Her rights resulting from her legitimacy by the laws of Spain were subsisting and continuing rights. They ran *pari passu* with the law and the public policy which incapacitated her until that law and policy disappeared, her rights surviving.

Mrs. Conté, as we have seen, was born in February, 1840, and her father's testament is dated in March, 1852, nearly twelve years after her birth. Did the testament fall by her legitimation in April, 1856? This presents another and a more difficult question. Article 1556 of our Civil Code, in the chapter that treats of donations *inter vivos*, adopting article 960 of the Code Napoleon, declares that " all donations *inter vivos* made by persons having neither children nor descendants actually living at the time of the donation, of whatever value those donations may be, .and on whatever account they may have been made, should they even be mutual, not excepting such as were made in favor of marriage, by any but the ascendants of the married persons, or by the one of them to the other, shall be considered as revoked, up to the disposable portion by the birth of children to the donor, even of a posthumous child, or by the legitimation of a natural child, if the child be born since the donation." Article 1698 of the Louisiana Code, in the chapter that treats of donations *mortis causa*, declares that " the testament falls by the birth of legitimate children of the testator posterior to its date." There is no article of the Napoleon Code corresponding to this article.

The French authorities referred to by counsel do not seem to afford much aid in determining the proper interpretation of article 1698 of our Code. On the question now before us the weight of authority found in the writings of the French jurists would seem to be in favor of the affirmative side of the question; but the solution must mainly be sought for in the interpretation together of the articles of our Code, and in ascertaining the spirit and purpose of our legislators in constructing our law bearing on the question. The policy of our law is to reprobate concubinage and the rearing of spurious offspring, an evil so well calculated to demoralize society. On the other hand, marriage sanctioned by Divine authority is highly favored and encouraged. The lawmaker, by liberal provisions, enables and invites the parent

of illegitimate offspring to repair civilly the wrongs which he has inflicted upon his children, wholly innocent of the offense for which they are proscribed. Actuated by the strong desire in justice to relieve the innocent, and in the interests of society, the legislator holds out the strong inducement of conferring upon the unfortunate children of unmarried parents all the benefits of legitimacy. This benevolent purpose seems to be announced by article 219 of the Code, which declares that "children legitimated by a subsequent marriage have the same rights as if they were born during marriage."

In view of the reasons upon which the law expressed by this article is manifestly founded, we can not clearly perceive why the lawgiver should make any exception in conferring upon illegitimates the benefits of legitimacy. If they are to have the same rights that appertain to legitimates, the impression is strong that no right belonging to legitimates is withheld, otherwise the benefit proposed would, in its most essential feature, be to a great extent destroyed, for the right of inheritance would, in cases like the one at bar, be denied. When a parent legitimates by marriage his illegitimate children, it would seem to be a fair presumption that he desires they should have all the rights they would have possessed had they been born during marriage. A right consequent upon legitimacy at birth is that of annulling donations made by the parent previously. If children, illegitimate by birth and subsequently legitimated by marriage, are to possess all the legal rights of the other class—and this we may presume to have been the object of the parent in legitimating them—the article 1698 of the Code should be construed liberally to secure the right sought to be obtained by the commendable act of the parent. A liberal interpretation of article 1698 we think would not regard its provisions as forming an exception to article 219, and exclude one class of heirs from the benefits conferred upon another.

In the case of Lewis v. Hare, 8 An., p. 378, it was contended that a testament does not fall on the birth of a posthumous child, or at least it would be sustained to the extent of the disposable portion in conformity with the provisions of article 1556 in regard to donations *inter vivos*. But our predecessors held "there was no sufficient reason to narrow the terms of article 1698, which are unqualified and comprehend equally both classes of children." In support of the view taken of the comprehensive terms of article 1698, the court said: "There is no reason to suppose that a testator would have been insensible to the welfare of a posthumous child if the contingency of its birth had suggested itself to his mind, any more than to suppose such insensibility in the case of a child born before his death. In both cases it is reasonable to presume the testator would have felt the promptings of parental love and the obligations of parental duty if the event had been foreseen.

37

By parity of reasoning, and also from the facts in this record that show the fervor with which the testator in this case cherished the dust of his dead children, is it unfair to infer that after legitimating his daughter he intended to revoke his testament?—an act, however, which he did not perform, but which it may be said he overlooked or thought unnecessary after accomplishing her legitimation.

We think it is in conformity with the spirit of the decision in the case of Lewis v. Hare, just referred to, to conclude that the effect upon the testament of Caballero by the legitimation of his daughter is the same it would have been had her birth occurred posterior to the time at which it was made.

It is therefore ordered, adjudged and decreed that the judgment of the district court be affirmed, with costs.

LUDELING, C. J., concurring. This suit is brought by Maria Dolores Conté, the daughter of J. M. Caballero, to annul the will of her father, and to be put in possession of his succession on the ground that she was legitimated by the marriage of her parents after the date of the testament.

The evidence establishes that J. M. Caballero lived in this city in concubinage with Carolina Visinier, a colored person; that the plaintiff, issue of this illicit connection, was born in February, 1840; that in 1852 Caballero made the will which is attacked in this suit; and that in 1856 he removed to Spain, the place of his nativity, with the purpose to live there permanently.

On his way to Cadiz, in 1856, Caballero stopped at Havana and there he married Caro.ina Visinier, the mother of plaintiff. Three years after his removal to Spain he returned to New Orleans, where he died in 1866. The plaintiff has never returned to Louisiana; she still resides in Spain.

The evidence in the record satisfies me that the plaintiff was legitimated by marriage, according to the laws of Spain, in 1856. Being legitimate in Spain, I maintain that the same character will belong to her in Louisiana and everywhere. Story's Conflicts, sec. 105.

Mr. Story says: "It seems, then, generally admitted by foreign jurists, that as the validity of the marriage must depend upon the law of the country where it is celebrated, the status, or state, or condition of their offspring, as to legitimacy or illegitimacy, ought to depend on the same law; so that, if by the law of the place of the marriage (at all events, if the parents were then domiciled there), the offspring, although born before marriage, would be legitimated, they ought to be deemed legitimate in every other country, for all purposes whatsoever, including heirship to immovable property." Story's Conflicts,

sec. b. 93. And he adds: "This is certainly the doctrine maintained by many, perhaps a large majority of foreign jurists." Sec. c. 93. And again he says: "The same doctrine is avowedly adopted by the courts of England. Lord Stowell on one occasion in effect maintained that by the law of England the status or condition of a claimant must be tried by reference to the law of the country where that status originated. The same doctrine was adopted by the judges of England in giving their opinion to the House of Lords. They admitted in the most solemn form, that the legitimacy or illegitimacy of a person must be decided by the law of the place where the marriage was celebrated; and that if by the law of that place (for example Scotland) a son born before the marriage between them be legitimated, that status of legitimacy must be deemed equally true and valid everywhere else where the question might arise." Sec. 93, e.; sec. 93, m. And the same author says (sec. 103): "Hence we might deduce, as a corollary, that, in regard to questions of minority or majority, competency or incompetency to marry, incapacities incident to coverture, guardianship, emancipation and other personal qualities or disabilities, the law of the domicile of birth, or the law of any acquired and fixed domicile, is not generally to govern, but the *lex loci contractus aut actus,* the law of the place where the contract is made, or the act done."

In this State this principle is substantially announced in the textual provisions of the Codes. Article 10 of the Civil Code declares that "the form and effect of public and private written instruments are governed by the laws and usages of the country where they are passed or executed." C. P., art. 13. That is, the validity as well as the effect of contracts must be governed by *lex loci contractus.* The contract of marriage between the plaintiff's parents and its effects must therefore be governed by the laws of Spain✓

This principle has often been affirmed by this court. 3 Martin 66, Le Breton *v.* Nanchet; 8 M. 134; 2 N. S. 93; 4 N. S. 1; 5 N. S. 570, Saul *v.* His Creditors; 19 La. 216; 11 La. 464, Andrews *v.* His Creditors; 8 R. 407. In Scott vs. Key, reported in 11 An., this court said: "If it be true that a general law of the place of domicile changing the status of its citizens according to circumstances is a personal statute accompanying the party to every other country—provided the circumstances which operate such change have occurred before the change of domicile, which we consider to be the settled doctrine in Louisiana—*a fortiori,* is a special law removing a disability from a particular citizen by name such a statute." * * "The maxim cited by Story (Conflict of Laws, sec. 51) from Boullenois, '*habilis* vel inhabilis in loco domicilii est habilis vel inhabilis in omni loco,' must, therefore, be deemed law in Louisiana." And it was held in the same case that the Arkansas statute (which was a personal statute) did not conflict with the statute of distributions of Louisiana, which is a real statute.

The case of Dupre *v.* Boulard, 10 An., p. 411, relied on by the defendants, is not in point. It appears from the opinion that the marriage in that case had been made in fraud of our laws. I consider the question presented by the facts of this case the same as if Caballero and his wife had always resided in Spain. In that event, could the plaintiff claim the annullment of her father's testament, made anterior to her legitimation? I am of opinion that she could. Article (1698) 1705 C. C. declares that "the testament falls by the birth of legitimate children of the testator posterior to its date."

The French text is, "le testament est caduc quand il est survenu des enfens depuis qu'il a été fait."

It is evident that the meaning of this article is that the will should fall if the testator should have children capable of inheriting from him after the date of the will. At the period when the will was made Caballero had no child who could inherit his estate; after the legitimation of the plaintiff he had then such a child. Legitimation is a fiction of the law, whereby one born out of lawful wedlock is considered the offspring of the marriage between the parents. Article 199 of the Civil Code declares "children legitimated by a subsequent marriage have the same rights as if born during marriage." The French text is an exact copy from the Code Napoleon, and is as follows: "Les enfans légitimés par le mariage subséquent ont les mêmes droits que s'ils étaient nés de ce mariage." It is evident that there is an inaccuracy in the English translation; it should have been translated "as if born of that marriage." This accords with the evident intention of the lawmaker, and with the views of the commentators on the Code Napoleon. Commenting on article 953 of the Code Napoleon, Marcadé says: "La légitimation est une fiction; mais cette fiction au lieu de faire remonter le mariage au jour de la conception ou seulement au jour de la naissance, fait redescendre et la conception et la naissance au jour du mariage." 2 Marcadé, p. 45. Zacharie says: "La légitimation est une fiction légal, mais elle n'a jamais d'effet rétroactif; elle ne remonte ni au jour de la conception ni au jour de la naissance; elle ne date qu'à partir du mariage." P. 675. "C'est le jour du mariage qui est le jour de la conception et de la naissance légitimes: Dies nuptiarum, dies est conceptionis et nativitatis legitimæ." 2 Marcadé, p. 46. Pothier, vol. 7, Traité des Donations Entre-vifs, p. 489, sec. 111.

This court said in Lewis *v.* Hare: "The testament falls by the birth of legitimate children of the testator posterior to its date. The reason of this provision is not given by the lawgiver, but is obvious. It is founded upon the reasonable presumption that the testator would not have given his property to others had he foreseen that he would afterwards have offspring. It would not be easy to suggest a case

more strongly illustrative of the wisdom of the law, which supplies by its own foresight the want of foresight of the testator, than the one before us. If this will should be carried into full effect the entire estate of the testator would be absorbed in legacies, and his child be, left destitute." 11 An. 378.

All that was said in that case applies with equal force in this case. I can not believe that the word " birth," in the English (" s'il est sur- venu des enfans " in the French) text, was intended to refer only to the natural birth of children, but to the advent of legitimate children by birth or by operation of law.

The laws of Louisiana never prohibited persons from inheriting on account of their color. " All free persons may transmit their estate ab intestato and inherit from others. Slaves alone are incapable of either." C. C., article 945.

"Legitimate children or their descendants inherit from their father and mother," etc. C. C., article 898.

It is not against the policy of the laws of Louisiana, therefore, to permit the plaintiff, a legitimated child, to take by inheritance the property of her father.

Neither has it ever been the policy of Louisiana to attempt to regulate marriages beyond her territorial jurisdiction.

I therefore concur in the opinion of Mr. Justice Taliaferro.

HOWELL, J., concurring. For the reasons assigned by the Chief Justice, I concur in the decree in this case.

WYLY, J., dissenting. A contract, if valid in the country where it is made, is valid everywhere, because the law of the place is the law of the contract. But this general rule has its exceptions. A contract against good morals, religion or the policy and institutions of the State where it is sought to be enforced, will not be recognized and pronounced valid, although it may be held valid in the country where it was made.

A contract for future prostitution; a contract to promote or reward the commission of crimes, and a contract for obscene publications are examples of the class founded in moral turpitude.

"Contracts made in a foreign country to procure loans in our own country, in order to assist the subjects of a foreign State in the prosecution of war against a nation with which we are at peace; contracts by our citizens or others to carry on trade with the enemy, or to cover enemy property, or to transport goods contraband of war; contracts to carry into effect the African slave trade," are examples of contracts

opposed to national policy and institutions. Such contracts are excepted from the general rule, because they are prejudicial to the interest of the nation and are repugnant to its policy. Story on Conflict of Laws, sections 32, 36, 38,· 245, 258, 259, 324; 13 Pet. 519.

The general rule that the contract of marriage, if good in the country where it is celebrated, is good everywhere, has likewise exceptions. An adulterous or incestuous marriage will not be recognized in this country, though valid where it was contracted, because it is against the policy of the State and the solid interest of society.

If an inhabitant of Turkey should emigrate with several wives to this State, his women would not have the status of wives here, although legally married at home, because our law condemns polygamy. When Caballero, a citizen of this State, married his colored concubine, Carolina Visinier, at Havana, in April, 1856, such marriage was prohibited, because the policy of this State was against the marriage of white and colored persons. C. C. 95. This marriage, though celebrated in the dominion of Spain and valid by its laws, can not be recognized as valid here.

In Dupre v. Executor of Boulard, 10 An. 411, it was held that: "The courts of Louisiana will not give effect to a marriage or to a marriage contract entered into in France between a white person and a person of color." Suppose, instead of seeking the dominion of Spain to make the contract of marriage with his colored concubine, which he was prohibited from making at home, Caballero had gone with a dozen of white concubines to Turkey and there married them, and after an absence of three years had returned with his women to this State, would they be entitled here to the status of married women, although at the time of the marriage it was contemplated that Turkey should be their future home and the marriage was valid by the laws of that empire? Is polygamy to be forced upon this State by such devices? Surely not. Foreign contracts can not be sanctioned and enforced where they are prejudicial to our own country or its citizens. The policy of the State and the safety of its institutions are considerations paramount to the courtesy due to laws of other countries or contracts made in conformity therewith.

The policy of our law, announced in article 95 C. C., prohibiting and declaring void marriages "contracted by free white persons with free persons of color," is in my opinion superior to any obligation founded on the comity of nations, to give effect to the laws of Spain or to the marriage contracted in conformity therewith by Caballero with his colored concubine, Carolina Visinier, in the year 1856.

But it is urged that the policy of this State has been changed, and there is nothing now repugnant to the marriage of such persons. If this be granted it would not affect the validity of a marriage con-

tracted and subsequently terminated by the death of the parties before this change of policy.

Caballero left this State in 1856 for the undoubted purpose of marrying, in the dominion of Spain, Carolina Visinier, a native of this State, with whom he had lived in concubinage for many years. After an absence of three years they returned to this city and lived the remainder of their lives, Carolina dying in 1860 and Caballero in 1866.

What was the status of Carolina Visinier at the time of her death in 1860 ? Was she the concubine of Caballero or was she his lawful wife ? Her status must be determined by the law in force at the time of her death. If she was his wife she was entitled to half the community property, and by succession transmitted it to her heir, the plaintiff, Mrs. Conté. If she was his concubine she was possessed of no legal rights, and was incapable of receiving even a donation from Caballero.

In my opinion the status of Carolina Visinier was that of a concubine by the laws of this State, of which she was a native, notwithstanding the marriage and three years residence in Spain, because no residence or contract made in a foreign land could give her, a native, a better status at home than she was capable of receiving by its laws, and because the contract of marriage, though lawful in Spain, was utterly without effect in this State, being at the time in contravention of its policy.

The change in our laws, under the constitution of 1868, can not be considered in determining the validity of the contract of marriage made in 1856 and terminated by death in 1860, which was by law at the time prohibited and declared void. C. C. 95.

As laws have no retroactive effect, the omission to incorporate article 95 of the Code of 1825 in the Revised Code of 1870 is of no consequence. It was the law prevailing at the time of the marriage and at the time of the death of both the spouses.

The law of this State must also determine the status of the plaintiff Mrs. Conté, who was born in this city in 1840, the illegitimate daughter of Caballero and Carolina Visinier. Her legitimation was prohibited by the law of this State, and no contract of marriage between her parents, nor any agreement on their part to change the place of their domicile, could alter her status and give her a better position at home than she was capable of acquiring. The law of this State at the time of her birth, at the time of the pretended marriage of her parents, and at the time of their death, gave her the status of a bastard, incapable of being legitimated, because the offspring of an illicit cohabitation between a white person and a person of color. An incestuous or adulterous bastard, born in this State, will always have the same status, notwithstanding the subsequent marriage of his parents, either at home

or abroad.. The law of the domicile of birth fixes the status of the person suing at that domicile, regardless of the status acquired by him in another country.

The plaintiff holding by the laws of Louisiana, the domicile of her origin, the status of a bastard, incapable of legitimation and incapable of inheriting, seeks to be declared by the courts of this State the legitimate daughter of Caballero, solely because she has acquired that status in Spain, a foreign country. She seeks to annul the will of a citizen of Louisiana and to be put in possession as heir of his succession, notwithstanding her incapacity to inherit according to the law of this State, where she was born and where her parents lived and died.

She points to the contract of marriage made by her parents when she was sixteen years old, in the dominion of Spain, and to the *ex parte* decree of her legitimation by a tribunal of that country, and insists that by the comity of nations this court should give effect thereto and maintain her demand as the legitimate heir of Caballero, notwithstanding such marriage and legitimation were prohibited and declared void by the law of this State, and notwithstanding the record shows that at that time her parents were citizens of this State, being then only absent from it about thirty days. The law of this State, the domicile of the deceased, must control in determining the capacity of his heirs, and foreign laws must yield to our own in fixing the personal status of the plaintiff, because this is the domicile of her birth. Mr. Justice Story in his work on the Conflict of Laws, page 91, section 93, says: "It is plain from what has been already stated and, indeed, is directly established by their positive declarations, that those of the foreign jurists already mentioned who affirm the general doctrine of the universality of the rule that capacity and incapacity depend upon the law of the domicile of birth, and that it equally applies to movable and immovable property situate in foreign countries, would hold the same rule applicable to the question of legitimacy or illegitimacy in regard to the inheritance of real property in all foreign countries."

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

In the celebrated Scotch case referred to by Judge Story, where the question was whether a son born of Scottish parents in Scotland before marriage, but who afterwards married there, could inherit lands in England as heir—a case tried in the House of Lords and in which was employed the first talents of England—it was conceded on all sides. that legitimacy was a status to be determined by the law of the party's birth-place.

"Another question (says Judge Story) also has arisen in England, whether a child born before marriage in one country, of parents, domiciled in that country, by whose laws a subsequent marriage would not legitimate him, would by a marriage of his parents in another

country, by whose laws such subsequent marriage would legitimate him, become legitimate so as to inherit lands in the latter country. It has been held by the House of Lords that the mere fact of marriage in such country, where there was no change of domicile, would not give him such a capacity to inherit land, and that the stain of illegitimacy by his birth was not wiped away by such marriage. And it was intimated that under the like circumstances in other respects the change of the domicile of the parents to the country where the marriage was celebrated would not have given any better title to inherit, as the stain of illegitimacy would be indelible. The converse case has been decided in France, where it has been held that if a child is born in a country (France) where he would become legitimate by a subsequent marriage, he will become legitimate by such subsequent marriage, although the marriage should take place in a country (England) where a different law prevails, and where a subsequent marriage would not have the effect of rendering him legitimate. The result of these two cases seems to be that the law of the place of birth of the child, and not the law of the place of the marriage of the parents is to decide, whether a subsequent marriage will legitimate the child or not." Story on Conflict of Laws, p. 91, section 93.

Judge Story says, also, that the same doctrine is maintained by Hertius, by Bonhier, by Boullenois, and by Merlin, viz: "That the law of the place of the birth of the child gives the rule as to legitimacy by a subsequent marriage."

Now, if the marriage of Caballero and Carolina Visinier, although valid in Spain, is held to have had no effect in Louisiana, then the plaintiff's claim, as the legitimate heir of Caballero, falls to the ground. But to defeat her pretensions it is not necessary to decide that that marriage was without effect in Louisiana, because legitimation is merely an incident—it is not of the essence of the contract of marriage. A marriage contracted in England subsequently to the birth of a son would not legitimate him, although such marriage would unquestionably be valid.

The marriage of English subjects domiciled in France, and there valid, would be recognized in England; but such marriage would not, in England, have the effect to legitimate an illegitimate child born of such persons in that country before going to France. Why? Because the law of the domicile of birth fixes the status of the child. This is unquestionably so when the adjudication of the question is sought in the courts of that domicile. I venture the assertion that there is no respectable authority to be found which maintains that the courts at the domicile of birth are required to look beyond the laws of the place in order to fix the status of the child.

It is the right of every country to determine by its own laws and for

itself what status it will give to the children of its subjects or citizens born within its own limits.

No change of domicile and no act or contract between the parents of an illegitimate child can give it at the domicile of birth a better status than it is capable of acquiring by the laws thereof.

It would be vain to fix the order of successions, and to establish the rule of the capacity or incapacity of heirs born in this State, if foreign laws or foreign contracts are to be admitted to defeat their operation.

It results, therefore, both from principle and upon authority that, as the marriage of Caballero with Carolina Visinier, if made in this State, would not have legitimated the plaintiff, their illegitimate daughter, the marriage which they contracted in the dominion of Spain in 1856 did not legitimate her.

Their marriage here would not have legitimated her, because of the operation of article 95 C. C., which prevailed till after the death of both her parents. It would not have legitimated her even if Caballero had been a colored man, because she was neither acknowledged by him in a notarial act nor at the registry of birth or baptism. Thomasson v. Raphel's Executor, 11 La 128. /

Much has been said of the benevolent purpose announced in article 219 C. C., which declares that : " Children legitimated by a subsequent marriage have the same rights as if they were born during the marriage." That it should be liberally construed because its purpose was to encourage marriage by holding out the strong inducement of legitimation to the parents of illegitimate children, as the means by which to repair the wrong inflicted on them. That this was its purpose I have no doubt, because concubinage is reprobated by law, and marriage is a highly favored institution. But this article was only intended to encourage the marriage of such persons as are capable of contracting it under the laws of this State. It was not intended to invite the marriage of " a free white person with a free person of color," because such marriage was prohibited by article 95 C. C. Nor was it intended to invite persons prohibited from marrying at home to seek a foreign country and there contract a marriage prohibited by our law.

It would be a reproach to the authors of our Code to say in adopting article 219 they intended to invite the marriage of white persons with persons of color, either at home or abroad, because a marriage of that character is expressly condemned and declared void by article 95 C. C. It results, therefore, from a fair interpretation of article 219 that a marriage of the character of that contracted by Caballero with Carolina Visinier in 1856 was not such a marriage as was intended to be embraced in its meaning. To hold that the marriage of a white per-

son with a person óf color, either at home or abroad, falls within the
provision of article 219, would violate its spirit and obvious purpose, and
would, as Judge Story says, be keeping the letter of the law to the ear
and breaking it to the sense.

There being, therefore, no law in this State to legitimate by subse-
quent marriage the child of a white person with a person of color,
because such marriage is not embraced in the meaning of article 219,
the marriage of Caballero with Carolina Visinier, in the dominion of
Spain, in April, 1856, did not legitimate the plaintiff, their illegitimate
daughter, who was born in this city, in 1840.

Legitimation being merely an incident of marriage and not of the
essence of the contract, the marriage of her parents might be held to
be valid and yet the legitimation of the plaintiff would not be a neces-
sary consequence.

The laws of this State not giving legitimation to a subsequent mar-
riage like that of her parents, their marriage in Spain did not have the
effect to legitimate her, because the rule is " the law of the place of
birth of the child, and not the law of the place of the marriage of the
parents, is to decide whether a subsequent marriage will legitimate the
child or not." Story on the Conflict of Laws, page 91, section 93.

But it is urged that this rule is contradicted by Justice Story, in
section 103 of the same work. Let this section be read with section
105, and in connection with the preceding ones, especially sections 73
and 93, and not the least contradiction will be found. The learned
author has stated the rule clearly in section 93, and he is not weak
enough to contradict himself flatly in the tenth section following.

It is also contended, on the authority of Scott v. Key, 11 An. 238,
that this court ought to recognize the plaintiff as legitimate, because
she acquired that status by the marriage of her parents in Spain.

The authority cited does not maintain the position, nor does it in
the least contradict the rule that "the law of the place of the birth of
the child, and not the law of the place of the marriage of the parents,
is to decide whether a subsequent marriage will legitimate the child
or not."

As the concurring opinion of Mr. Justice Spofford in the Scott case
will show what was decided, I will copy it in full, it being very brief.
It is as follows :

" It was competent for the Legislature of Arkansas, the domicile of
his origin, to fix the status of William Estill. In substance and effect
that Legislature gave him the status of a legitimate son of Samuel
Estill. The Arkansas statute legitimating William Estill was a
personal statute. Therefore the status of a legitimate son of Samuel
Estill would accompany William Estill into whatever country he might
go. He came hither with the status. He inherited by our law from

his father Samuel Estill, because he was to all intents and purposes a legitimate son, having become so by the law of the domicile of his origin, and not in fraud of our law nor in violation of its policy."

How an authority, recognizing the legitimation of a party at the domicile of his origin in a case not in fraud of our law, nor in violation of its policy, can support the case of the plaintiff, who was not legitimated at the domicile of origin and whose legitimation by the marriage of her parents was prohibited by our law and in violation of its policy," I can not imagine.

In Barera v. Alpuente, 6 N. S. 69, a case analogous to the one before us, Judge Porter, the organ of the court, said : " The general rule is that the laws of the domicile of origin govern the state and condition of the minor into whatever country he removes."

In Brosnaham et al. v. Turner, 16 La. 439, this court, in speaking of a foreign statute, said : " Nor can we examine the validity of the legislative act, where it operates on property within their jurisdiction, or authorizes acts of its own officers.  But its extra territorial effect is a different affair, which we protest against admitting when it comes to operate on the right of real property within the State, or even supposing it to be what plaintiff contends it to be, a mere removal of a personal incapacity.  If this incapacity relates to the inheritance of real estate in Louisiana, we are bound to say they can have no effect."

In conclusion, therefore, I maintain that the marriage at Havana, in April, 1856, being repugnant to our law, was utterly without effect in this State ; and the marriage being without effect the legitimation of the plaintiff as an incident thereof was also without effect.  But whether the marriage was without effect or not, the legitimation of the plaintiff was not a necessary consequence, and it did not result from the marriage, because the plaintiff was incapable of legitimation by the law of her domicile of birth; that in suing for the succession of her father she can not set up a foreign status of legitimation as a ground for inheriting, because that status was not acquired at the domicile of her origin, and, on the contrary, is repugnant to its policy.

The status of the plaintiff is fixed by our law, because her parents were citizens of this State, and this is the domicile of her origin.  She can not expect this court to recognize a foreign status prohibited by the law of her birth-place.

I therefore think that the plaintiff's demand should be rejected, and the will of Caballero ought to be maintained; and for the reasons given I dissent in this case.