## The Public Administrator *vs.* Hughes.

*In the matter of the Estate of* Emma Hughes, *deceased.*

The grant of administration follows the law of the place where the estate is to be administered; the distribution of the property is governed by the law of the domicil of the deceased.

Our statute gives the right to administer to the next of kin entitled to share in the distribution of the estate; and where the intestate was domiciled in a foreign country, the law of the domicil determining who succeeds to the estate, also determines who has that interest which by our law is a necessary qualification to administer.

E. H., an illegitimate, domiciled in England, died intestate and unmarried, leaving assets in New-York,—held that by the law of England, there was an absolute obstruction of the course of succession, she having no lineal descendants, and no lawful ancestors or collateral relatives.

The goods of an intestate who leaves no relatives, do not pass to the State by

any derivative title from the last owner, but by virtue of the sovereign pre-rogative to the custody of *bona vacantia*, within the territory.

Whether as to assets in this State of a foreign intestate dying without relatives, The sovereignty of the country where he was domiciled, will be regarded as forming the basis of any title to the assets.—*Quære.*

The *lex domicilii* being recognized as establishing the rule of distribution, the relatives of the intestate, an illegitimate, on the part of the mother, not en-titled to distributive shares by the law of the domicil, have no valid claim by the law of the place where the assets are situated.

  · F. S. Kinney, *for Richard Hughes.*

  J. S. Thayer, *the Public Administrator in person, and by* Charles Edwards.

The Surrogate. The intestate, Emma Hughes, was a British subject, domiciled in England at the time of her death. She was an illegitimate. The Public Administra-tor now applies for letters of administration; and a similar application is made by Richard Hughes, a lawful son of Mary Ann Hughes, the mother of the intestate. The basis of my jurisdiction in the matter, rests on the fact that the deceased died possessed of assets in this State.

The rule is now well established, that while the grant of administration follows the law of the place where the estate is to be administered, the distribution of the pro-perty is governed by the law of the domicil of the de-ceased. In what place distribution is to be made, whether the estate is to be collected here, and then remitted to the foreign administrator in bulk to be admin-istered by him, or whether creditors and distributees here, can have their claims and shares paid here, before the fund is sent abroad, depends upon a variety of circumstances, and must be determined in the exercise of a sound discre-tion by the Judge, in consonance with certain general rules, but in subjection to the peculiar features of each particular case. But whether administered here, wholly or partially, the rule which governs the distribution to the next of kin, is the *lex domicilii.* (*Williams on Executors,* 1301, *and cases cited in note f.*)

THE PUBLIC ADMINISTRATOR *vs.* HUGHES.

Our statute gives administration to the next of kin of the deceased, who would be entitled to succeed to his personal estate, and requires, therefore, that the applicant for letters not only should be a relative, but a relative entitled to a distributive share. To find who are entitled to succeed to the personal estate of a person domiciled abroad, it is incumbent upon me, consequently, to inquire into the law of the place of his domicil.

Emma Hughes was domiciled in England; being illegitimate, *nullius filia*, she had no inheritable blood; and being unmarried, no lawful kindred. She could have no legal kindred, except lineal descendants; having no legal ancestors, she could have no collateral relatives. (*Colvin vs. Proc. General*, 1 *Hagg.*, 92.) By the law of England, therefore, Richard Hughes had no right to a distributive share in the estate of the deceased, and consequently cannot be entitled to letters of administration here.

But the question naturally arises, what becomes of this estate ? There is an absolute obstruction of the course of succession. In such a case it was formerly held (*Salk.*, 37) that the Ordinary could seize the goods of the intestate, and dispose of them *in pios usus*, but it now seems the King is entitled to them as *ultimus hæres*, subject to the payment of the debts (*Megit vs. Johnson*, 2 *Doug.*, 548); but it has become the practice to grant letters patent, transferring the right of the crown, with a reservation of a tenth, or some other charge ; and the grantee of course takes administration. (*Williams on Executors*, 357 ; *Jones vs. Goodchild*, 3 *P. Wms.*, 33 ; *Rutherford vs. Maule*, 4 *Hagg.*, 215 ; *Stote vs. Tyndall*, 2 *Cas. Temp., Lee*, 394 ; *Taylor vs. Haygarth*, 14 *Simon.*, 8 ; *Cave vs. Roberts*, 8 *Simon.*, 215.)

I do not understand, however, that the goods of an intestate who leaves no relatives, go to the crown by virtue of any title. The case is by no means analogous to that of real estate, where the blood of the person last seized being extinct, and the inheritance having failed, the land

becomes *feudum apertum*, and reverts back to the King, as the original owner, grantor and Lord of the fee. The escheat is thus worked out through the medium of the original right of domain, the reversion of the primary title. (*Black. Com., Lib.* 2, *c.* 15.)  With goods, however, it was otherwise.  " Whatever moveables are found upon the surface of the earth," says Blackstone (*Com., Lib.* 2, *c.* 26), " or in the sea, and are unclaimed by any owner, are supposed to be abandoned by the last proprietor, and as such, are returned into the common stock and mass of things, and therefore, they belong, as in a state of nature, to the first occupant or fortunate finder."  Even waifs, treasure trove, and estrays, which in progress of time became the property of the King, were originally the property of the finder, but for the purposes of peace and order, they ultimately became rights annexed to the Supreme Power. " *Hæc quæ nullius in bonis sunt,* * * * *et quæ olim fuerunt inventoris de jure naturali, jam efficiuntur principis de jure gentium.*"  (*Bracton, L.* 1, *c.* 12.)  This nevertheless, as to vacant goods, was a matter of prerogative, not of derivative title.  Indeed, the very groundwork of an administration of the property of an intestate, consists in the fact that there is a failure of title, and his assets have become *bona vacantia.* (*Hensloe's Case,* 9 *Reports,* 37, 38.)  The King, therefore, *seized* upon his goods as the *parens patriæ,* and general trustee of the kingdom, and the right to administer at first deputed to the Prelates of the Church, and afterwards transferred to the relatives of the deceased, is in truth based upon this very prerogative of seizing upon vacant goods.  The rule to which I have already adverted, that the grant of administration follows the *lex loci rei sitæ,* is at once an illustration and proof of this position. It follows, that the right of the crown,—flowing not from a derivative title from the last owner, but from the fact of a failure of all title and the want of an owner, whereby the goods are vacant,—can only be exercised upon moveables within the kingdom.  The sovereign has not, of course, the

power to seize upon assets within the territory of another independent sovereignty. There is neither the occasion nor the means of exercising such a prerogative; not the means, beause his laws have no extra-territorial operation, and not the occasion, because the assets to be seized are not *bona vacantia* within the limits of his power, but on the contrary, are in another country and under another jurisdiction. In the case of the American subject, who died in England *in itinere* (*Aspinwall* vs. *The King's Proctor*, 2 *Curteis*, 246), the interesting point involved in the matter now before me, was slightly adverted to. The Court thought, that the government of the country in which the property was found, " has a right to the custody of the property till a superior title to it can be shown," but at the same time it was intimated, that if it could be shown that the intestate died without relations, and the property had devolved upon the American Government, "the Court would be inclined to grant letters of administration to the Consul." The case of *Sidy Hamet Benamor Beggia*, 1 *Add.*, 340, was referred to, where the deceased, who had been Consul of the Emperor of Morocco, at Gibraltar, died at that place, without leaving any proper heir by the Mahomedan Law, and administration was decreed to a party specifically empowered to take it, on behalf of the Emperor. Sir Herbert Jenner justly observes of this decision, that the Emperor of Morocco " claimed, not the custody of the property, but the interest itself; the *jus in re* was in him." I may also add as a point worthy of remark, that the deceased was a public functionary, resident at Gibraltar only in a Consular capacity, and that proof was exhibited to the Court of the Emperor's *title* to the deceased's effects in behalf of the national treasury, by the Mahomedan Law.

I do not find, however, any case which has carried the fiction that *mobilia sequuntur personam*, to such an extent, as by an imaginative process to suppose the effects, which are in fact in New-York, to be in England, for the sake of subjecting them to an imaginative seizure there, for the

17

benefit of the King. The *lex domicilii* prevails only by the comity of nations, and not by any intrinsic force, or *proprio vigore.* (2 *Kent's Com.*, 406; *Wheaton's Inter. Law*, 134—5, 6. *Sub.* 2. 4 *Kent*, 423—5.) It seems to be the universal law of all nations, that the moveables of an intestate accrue to the State within whose territory they are found, subject only to such a rule of distribution as may be adopted by that sovereignty. It has become a settled principle among civilized nations, to substitute for the domestic rule of distribution, or rather adopt in its place, the law of distribution which prevails in the country where the deceased was domiciled. But does this principle run any further? When, according to the domestic statute of distributions, there is a failure of distributees, the property remains in the State for want of claimants; when, according to the foreign law of distribution, there is a failure of distributees, why should not the State in this case as well as in the other, continue to hold the property for want of claimants? In the present case, Emma Hughes left no person who could demand the estate according to the laws of England, her place of domicil; and even the crown would have no title to it, were it in fact in that jurisdiction, except from an entire failure of all relatives of the deceased,—the absence of any one having any title. This kind of negative title, based on no intrinsic, vital, or affirmative right, but growing out of an utter absence of any person capable of asserting a claim; not composing a part of the law of distribution prevailing in the domicil, but being an appendage of sovereignty; not indeed the result of any positive law, but the incident of possession without accountability, I feel strongly inclined to consider, not such a part of the *lex domicilii*, as should prevail over the *lex loci*.

If the crown, however, have any rights in this case, the claim is not represented before me. Applications for grants in such instances are addressed to the " liberality of the crown" (4 *Hagg.*, 213), and it is usual to take security from the grantees, " to refund in case any person should appear

and make good their claim as relations, or under a will, for in either case the crown would be a mere trustee for them." There is a regular proceeding for procuring such a grant (*Hubback's Ev. of Succession*, 74, 78), and though expensive and burdensome, it would not be proper for me, if the English Government has any title, to anticipate to whom the grant would be made, or upon what reservations, or to dispense with the guaranties always taken in England for the protection of possible future claimants. Besides, it is not necessary for the purpose of adjudicating upon the application of Richard Hughes, to determine at this stage of the case, whether the effects will ultimately belong to the British Government or to the State of New-York. I have said enough to indicate, that, in my opinion, the question is at least not free from doubt, and involving as it does a principle of grave moment, I do not now feel inclined to decide it, when the decision is not necessary for present purposes. For it makes no difference to Richard Hughes, in his present application for letters of administration, whether the surplus shall ultimately go to the State or to the crown. It is enough that it will not come to him, that he has no interest in it by the law as it now stands.

It is insisted, however, in favor of his right to administer, that there being no one entitled to a distributive share of this estate in England, it ought to be distributed according to our law. I cannot see how this is possible. Had Emma Hughes been domiciled here, her estate would have been distributed according to our law. Formerly, the property of an illegitimate, who died intestate, unmarried and without descendants, passed to the State. By the Act of 1845 (*Laws* 1845, *c.* 236), it was provided, that "if the deceased shall have been an illegitimate, and have left a mother, and no child, or descendant, or widow, such mother shall take the whole surplus, and shall be entitled to letters of administration in exclusion of all other persons; and if the mother of such deceased shall be dead, the relatives of the deceased on the part of the mother,

shall take in the same manner as if the deceased had been legitimate, and be entitled to letters of administration in the same order." At the time of the death of Emma Hughes, her mother, Mary Ann Hughes, was dead, and if the Act of 1845 governs, then Richard Hughes, the son of Mary Ann Hughes, would be entitled to administration and distribution, the same as if Emma Hughes had been legitimate. I do not, however, think the Act of 1845, at all applicable to the case; it is, like the Statute of Distributions, of which it is an amendment, intended to apply only to intestates domiciled in this State. I do not see how there can be two rules of distribution; if we take the one, we must reject the other. Having once adopted the principle, that the property of an intestate is to be distributed according to the law of his domicil, and having ascertained by that law, that there is an obstruction in the line of succession, and an entire failure of relatives, it would be inconsistent to turn around and adopt a new rule. The presumption is, that the Act of 1845, which is a graft upon the Statute of Distributions, was not intended by the Legislature to affect the law of domicil now universally recognized by all civilized nations in cases of intestacy. An invasion of that rule has never been sustained in favor of the relatives of a legitimate, and the relatives of an illegitimate ought not to be placed in any better position. In fact it is a part of the *lex loci*, that distribution is to be made according to the *lex domicilii*, and if by the *lex domicilii*, no one is entitled to succeed, then by the *lex loci*, no one is entitled to succeed. / The property passes to the State. The State may, from comity, admit the claim of a foreign government to it, or may make a grant of it to individuals here; but the same claims upon the liberality of the government might not be thought to exist in this instance, as in the case of an illegitimate resident; and in any event, it is not for me to conjecture what the policy of the State should or might be; it is quite enough that it has not been declared.

If this conclusion be correct, it follows that Richard Hughes has no interest in the estate, and in consonance with my previous determination on that point, having no interest, he is not entitled to letters in preference to the Public Administrator.