NEW YORK COUNTY, HON. D. C. CALVIN, SURROGATE.—JULY, 1876.

## MINOR *v.* JONES.

*In the matter of the Estate of* ANTHONY JONES, *deceased,*

The validity of a marriage is to be determined by the *lex loci contractus.*

But the law of the domicile of the deceased governs the distribution of his personal estate.

No particular form or ceremony in required by the law of this State, to constitute a valid marriage.

A marriage between slaves, contracted in a slave state, before the Emancipation, with the consent of their masters, and according to the custom of marriage among slaves, and in a manner which if contracted within this State would be a valid marriage here, must when drawn in question in the courts of this State, be adjudged a valid marriage.

THIS was a motion to confirm a report of the late Surrogate Van Schaick, made by him, as referee, appointed by the late Surrogate Hutchings, which had been submitted to Mr. Van Schaick, after he succeeded Mr. Hutchings, as Surrogate, with the understanding that the whole question was open for consideration.

The facts in evidence were as follows : The intestate, Anthony Jones, died in the city of New York, April 15, 1873. He was a colored man, born in Virginia, a slave, the property (so called) of William Jones, who resided at the Wilderness, Spottsylvania County, Virginia. The deceased worked for Mr. Jones as a farm hand, and in gold mines, until he ran away, and was afterwards captured, and sold to one John Allis, from whom he escaped about 30 years ago, and came back to New York, where he continued to reside until he died, leaving property, in this city. Patsy Minor, a colored person born in the state of Virginia, was a slave, and belonged to Miss Lucinda Gordon, who married William Jones, the owner of Anthony Jones, the decedent; and Patsy there-

by became the property of William Jones, and continued a slave, until liberated by the emancipation proclamation.

Anthony Jones and Patsy Minor met when they were comparatively young, resided in the same vicinity, and became intimate; he paid her considerable attention for six or seven years, and repeatedly asked her to marry him, and she at length consented to do so. They obtained the consent of their respective masters to marry, and finally came together, and lived and cohabited together as man and wife. This relation continued for about 13 years, by consent of their masters, and until Anthony Jones escaped to the North. During that period, they were faithful to each other in the relations of man and wife; had four children, all of whom died in infancy, except one, who now called himself Anthony Smith, and was one of the parties to these proceedings, and now resided at Yazoo City, Mississippi.

Anthony Jones and Patsy Minor were married according to the custom among slaves, and it was shown that the distinction was recognized among slaves, and by their masters, between such lawful connections, and illicit intercourse; and that those who cohabited without such marriage were regarded as disreputable; that during the period that they lived as husband and wife, they recognized and treated each other as such, and were so recognized by their masters and friends, and their children were recognized and treated as theirs.

Anthony Smith was born after his father escaped to the North, and the only recognition of him, by his father, was by a letter written to his mother from New York, in which he inquired about their child.

Before the alleged marriage with Anthony Jones, Patsy Minor lived and cohabited with a slave, by the name of James Willis, who was sent South by his mas-

ter, and he never after that lived with her, but there was no evidence to show the nature of their relationship, whether by consent of their masters, or whether it was regarded as a marriage.

About eight or nine years after the escape of Anthony Jones, Patsy Minor, believing him to be dead, married Gabriel Minor, her present husband.

Anthony Jones, after his escape to the North, lived and cohabited with a certain woman, as his wife, who died before him, leaving no issue.

It was conceded by the respective counsel, that the times when Anthony Jones and Patsy Minor came together, and lived and cohabited as man and wife, the laws of this State declared that all marriages contracted, or which might be contracted where one or both of the parties was, or might be slaves, should be equally valid, as though the parties were free, and the child, or children of such marriages, should be deemed legitimate.

L. H. ARNOLD, *for public administrator.*

BENJ. WILLIS, *and others, for the next of kin.*

THE SURROGATE.—The questions to be determined in these proceedings, are, whether the alleged marriage of Anthony Jones and Patsy Minor, was such a marriage as should be recognized as valid and binding by the laws of the State of New York, so that Patsy Minor shall be entitled to a share of her husband's estate, as the widow ; and whether Anthony Smith is legitimate, so that he is entitled to receive the residue of his father's estate, as next of kin, under the laws of this state.

It is admitted substantially by the respective coun sel, that under the statute of Virginia, at the time when the alleged marriage of Anthony Jones and Patsy Minor took place, and they cohabited together, their union

was not such a marriage as was recognized to be law-ful by the statute of Virginia : hence, particular reference to these laws is not necessary for the purposes of this proceeding.

The new constitution of Virginia (Art. 11, p 100, of the Code of 1873), reads as follows : " The children of parents, one or both of whom were slaves at, and during the period of cohabitation, who were recognized by the father as his children, and the mother was recognized by such father as his wife, and was cohabited with as such, shall be as capable of inheriting any estate whereof such father may have died seized, or possessed, as though he had been born in lawful wedlock."

The Code also provides, at page 841, section 4, that " when colored persons before the passage of this Act shall have undertaken and agreed, to occupy the rela-tion of husband and wife, shall be cohabiting together as such at the time of its passage, whether the rite of marriage shall have been solemnized between them, or not, they shall be deemed husband and wife, and be en-titled to the rights and privileges, and subject to the du-ties and obligations, of that relation as if duly married by law," &c., " and all their children shall be deemed legitimate whether born before, or after the passage of this Act : and when the parties have ceased to cohabit · before the passage of this Act, in consequence of the death of the woman, or from any other cause, all the children of the woman recognized by the man to be his, shall be deemed legitimate."

The validity of a marriage is to be determined by the *lex loci contractus.* (2 *Kent's Com.,* 12 *Ed.,* 91–2, *notes; Smith* v. *Woodworth,* 44 *Barb.,* 198 ; *Medway* v. *Needham,* 16 *Mass.,* 157 ; *Putnam* v. *Putnam,* 8 *Pick.,* 433 ; *West Cambridge* v. *Lexington, Id.,* 506 ; 512, *Caujolle* v. *Ferrie,* 23 *N Y.,* 139.)   But the law of domicile of the deceased

governs the distribution of personal property. (2 *Kent's Com.*, 12 *Ed.*, 426, 431, note *B.*; *Pub. Adm'r.* v. *Hughes*, 1 *Bradf.*, 125; *Bloomer* v. *Bloomer*, 2 *Id.*, 339 ; *Hegeman* v. *Fox*, 1 *Redfield*, 299.)

By chapter 44 of the laws of 1809, section 2, it is provided " that all marriages contracted, or which may hereafter be contracted, wherein one or more parties was, were, or may be slaves, shall be considered equally valid as though the parties thereto were free, and the child or children of any such marriage shall be deemed legitimate."

By this act, slaves in this state, or persons who may have been such, seem to be placed on the same footing as other citizens, in respect to the validity of their marriage; and hence, what would constitute a marriage between white citizens of this state, would constitute a marriage between those who are, or may have been, slaves.

The agreement of Anthony Jones, and the female now called Patsy Minor, to live together, as man and wife (certainly with the consent of their masters) and the continued cohabitation, as such, would constitute a marriage under the laws of this state, if they had been at the time, residents of the state of New York.

The law is well settled that no particular form or ceremony is required by the laws of this state to constitute a valid marriage; but marriage is deemed a civil contract to which the consent of the parties is deemed essential (*Clayton* v. *Wardell*, 4 *N. Y.*, 230,) and such marriage may be inferred by recognition, matrimonial cohabitation, &c. (*Matter of Taylor*, 9 *Paige*, 611; *Brinkley* v. *Brinkley*, 45 *Id.*, 184.) In the case first above cited, it is held that all that is essential to the validity of marriage, is a present agreement between competent parties, to take each other for husband and wife.

It is urged by counsel for the claimants, Patsy Minor and Anthony Smith, that the proclamation of emancipation relieved the parties of all disability under the laws of Virginia, and that thereby their marriage was validated.

It cannot be successfully denied that the effect of the proclamation was to relieve all the slaves from the disabilities attendant upon their servitude, and that they became at liberty thereafter to contract marriage in the same manner as white citizens :—but it is a serious quesion whether by force of the proclamation the relations of the parties not recognized by the laws of Virginia as a marriage, could be made to constitute a lawful marriage as to the law of that state; and if not lawful as to the law of that state, it is also a serious question whether the rule that the validity of contracts must depend upon the place where they are made, is to be relaxed as to marriage contracts.

Story (*Conflict of Laws*,) in treating upon the subject of marriage, says, at section 108, " marriage is treated by all civilized nations as a peculiarly formed contract—it is in its origin a contract of natural law—in civil society it became a civil contract, regulated and prescribed by law, and endowed with civil consequences;" and in section 109, he says, " but it will be observed that marriage is a contract *sui generis*, differing in some respects from all other contracts—but it differs from other contracts in this, that the rights and obligations, or duties arising from it are not left entirely to be regulated by the agreement of parties, but are to a certain extent matters of municipal regulation." " Marriage is a contract *sui generis* and the rights, duties, and obligations, which arise out of it are matters of so much importance to the well being of the state that they are regulated, not by private contract, but by public law of the state,

which is imperative on all who are domiciled within its territories;" and at section 112, the author says.: " In short, a marriage which is contracted according to the *lex loci*, will be valid all the world over."

" In expounding or enforcing a contract entered into, in a foreign country, and executed according to the laws of that country, regard will be paid to the *lex loci*, and the contract is evidence that the parties had in view the law of the country, and meant to be bound by it, but the parties who are domiciled here cannot be permitted to import into this country the law peculiar to his own case, which is in opposition to those great and important public laws, which our legislature has held to be essentially connected with the best interests of society."

This quotation it accredited to a learned Scotch judge, but commended by Chief Justice STORY. The general principle certainly is, that between persons *sui juris*, marriage is to be decided by the law of the place where it is celebrated. If valid there, it is valid everywhere. It has a legal ubiquity of obligation. If invalid there, it is equally invalid everywhere. And the only exceptions to this rule, are stated to be polygamy and incest, as repugnant to good morals, and prohibited by Christianity.

In *Kelly* v. *McCarthy* (3 *Bradf.*, 7), it is held that the weight of authority is in favor of the supremacy of the *lex loci domicilii*, over the *lex loci contractus* after the husband and wife have removed to another state, as to property subsequently acquired.

In *Jackson* v. *Lervey* (5 *Cow.*, 397), it is held that the Act of 1809, above cited, was retrospective, and legalized all marriages and births of slaves before, as well as after, its passage; but of course the act could have no effect upon a marriage relation contracted or subsisting in another state; for the act itself, in its first section,

makes provision for persons born slaves within this state. Story, at section 96, says that it has been solemnly decided that the Law of England abhors, and will not endure the existence of slavery within that nation, and that consequently, as soon as a slave lands in England, he becomes *ipso facto*, a free man, discharged from a state of servitude.

Independent of the provisions of the constitution of the United States, for the protection of the rights of masters, in regard to domestic fugitive slaves, there is no doubt that the same principle pervades the common law of the non-slave holding states of America, that is to say, foreign slaves would no longer be deemed such, after their removal thither.

It is clear that slavery and its attendant incapacities are opposed to the public policy of this state, as shown by the act of 1809, and the Revised Statutes, Title 7, Chap. 20, Part 1st, as amended by Chapter 247, *of the Law of* 1841, (*Lemmon* v. *The People*, 20 *N. Y.*, 562.)

If, as has been repeatedly held, polygamous marriages, though valid in a sister state, will not be recognized in this state, by force of the comity existing between the several states, is it not equally logical that this state by reason of the comity existing between such states, will not be compelled to hold that the relation which existed in the state of Virginia, which was recognized by public sentiment, as a marriage, and would conform to our laws respecting the contract of marriage, is no marriage?

Is not the one case equally repugnant as the other, to the principles of freedom, justice, and good morals, recognized in this state?

In *Girod* v. *Lewis*, (6 *Martin, La. Rep.*) it was held that the marriage of slaves was void as to any civil effect resulting from such contract, because slaves had no legal

capacity to assent to any contract.   With the consent of their masters they might marry, and their moral power to agree to such contract or connection as that of marriage cannot be doubted; but whilst in a state of slavery such relation could not produce any civil effect, because slaves were deprived of all civil right.   But it was further held that manumission gave to a slave his civil rights, and made the contract of marriage legal and valid by consent of the master and the moral assent of slave from the moment of freedom, although dormant during slavery ; and produces all the effects which result from such contract among free persons.

If manumission by the master could produce all the effects which result from a legal contract of marriage between free persons, may it not be well contended that the emancipation of the slave by the sovereign power of the nation, legalized the state of marriage existing in a state of slavery ?

Indeed it would be a reproach to the free and liberal spirit of our state constitution and laws, to hold that the emancipation of the slave intended to usher in a new and juster era, was powerless to effect the free and salutary result produced by individual manumission, in a state where servitude prevailed according to law and public sentiment.

In *Corbett* v. *Poelnitz (1 Term R., 8)*, LORD MANSFIELD uses this language : " But then it has been properly said that times alter, and new customs and new manners arise : these occasion exceptions, and justice and convenience require a different application of those exceptions within the principles of the general rule."

The danger resulting from an effort on the part of an individual judge to conform the institutions and laws to his understanding of the improved spirit of the age, is fully appreciated.   And the idea that the dictates of

individual conscience may excuse disobedience of laws and constitution, should be repudiated, as hostile to every well-settled principle of justice and safety ; but in the construction of law and constitution, I think it is the duty of a judicial officer to respect the advanced public sentiment of the present, when the public sentiment has assumed shape and consistency by a change of the constitution and laws of the land, and that in determining the force and effect of the relations existing under the constitution and laws, which recognized slavery, when the question has to be determined under a condition of things where servitude is repudiated, there should be an effort in good faith to give effect to such well defined change of public sentiment.

Applying these principles to this case, I am of the opinion that Patsy Minor is the lawful widow of Anthony Jones, deceased, and entitled under our law to one-third of the personal estate of her deceased husband and a dower interest in the realty ; that her subsequent marriage to Minor, did not, and could not, affect the marriage relation between her and the intestate, especially as it appears that her marriage with Minor, was eight or nine years after the escape of the deceased, when she supposed him to be dead.

By the same reasoning, Anthony Smith is the lawful son and heir of the deceased; but he is more particularly so under the laws of Virginia, of 1865, which provide that wherever negroes have cohabited as man and wife, and shall have ceased to cohabit before the passage of that act, for any cause, all the children of the woman, recognized by the man to be his, shall be deemed legitimate.

This recognition was evidenced by the deceased's letter to his wife, making inquiry in respect to the child; and it is quite clear, that if the deceased had died an

inhabitant of the state of Virginia, Anthony Smith would have been recognized as his legitimate child, and entitled to succeed to his father's estate; and if, by the laws of Virginia, he would be so recognized, it cannot be doubted that the courts of this state, under the circumstances detailed, should so recognize him.

The fact that these principles are invoked, not to divest any property or rights already vested, or acquired, but simply to confer such rights upon those who are entitled by the laws of nature, and common justice, should not be overlooked; and no technicality should be interposed for the purpose of bestowing the property in question upon the people of this state, rather than upon those who seem by every consideration of justice to be entitled to it.

As the result of the above conclusions, Isaac Smith, and Elizabeth Keaton, alleged surviving brother and sister of the deceased, are not the next of kin, and not entitled to any of the estate of the intestate.

Decree accordingly.