FRANK IRVING *vs.* LEONARD A. FORD, administrator.

Suffolk.    March 12, 1901. — May 25, 1901.

Present: HOLMES, C. J., LATHROP, BARKER, HAMMOND, & LORING, JJ.

*Marriage*, Between slaves. *Child*, Statutory legitimation. *Conflict of Laws*, Exterritorial effect of law affecting personal status. *Slave*, Escaping to free State. *Disseisin.*

Whatever may be the presumption as to the common law in this country concerning marriages between free persons, there is no presumption that the common law of Virginia in 1846 gave any effect to a ceremony of marriage between slaves performed by the master of one of them followed by a cohabitation of eight years.

The statutory legitimation of a child can be brought about without the fact or fiction of a marriage, by a simple fiat. Per HOLMES, C. J.

A statute of Virginia legalizing the marriages of colored persons living together as husband and wife on February 27, 1866, provided, that, where the parties had ceased to cohabit before that date, all the children of the woman recognized by the man to be his should be deemed legitimate. Before the date named in the statute a man slave left his slave wife in Virginia and acquired a domicil in Massachusetts. Later he visited Virginia and there recognized as his a child of his slave marriage domiciled there. The father died intestate, domiciled in Massachusetts and leaving property here. *Whether* the Virginia child was entitled to the distributive share of a legitimate child in Massachusetts, or whether in order that the statute should have such exterritorial effect both parties must have been domiciled in Virginia when the act of recognition was performed, even if the domicil of the child and the bodily presence of the father would be sufficient to make the statute operative in Virginia, *quære.*

By the common law a disseisor got a title, although by wrong, and left only a right of action to the disseisee. So, a runaway slave, so long as he was *de facto* free, though liable to recapture, had the civil rights of a free person in a free State to which he had escaped. Per HOLMES, C. J.

Before the abolition of slavery a marriage in this Commonwealth of a fugitive slave was lawful while he remained here, whatever effect recapture might have had upon it. Such a marriage continuing after the abolition of slavery is not to be disturbed.

PETITION, in the Probate Court, of Frank Irving, of Portsmouth in the State of Virginia, alleging that he is the heir at law of Robert Irving, otherwise known as Sheridan W. Ford, of Chelsea in the Commonwealth of Massachusetts, and further alleging that Leonard A. Ford falsely had represented himself to be a son of Robert Irving, otherwise known as Sheridan W. Ford, and had petitioned the Probate Court for letters of admin-

istration to be issued to him, falsely declaring that Mary A. Ford, widow, and Leonard A. Ford, a son, and Annie E. Ford, a daughter, were the only heirs at law and next of kin of the deceased, the present petition praying that these names might be stricken out of the petition for administration and those of Frank Irving, son, and Julia Ann Brown, widow, be inserted in their stead, filed July 7, 1899.

In the Probate Court, *Grant*, J., dismissed the petition, and the petitioner appealed. The case was heard by *Lathrop*, J., who, at the request of the petitioner, reported it for the consideration of the full court, finding the facts to be as follows :

" In or about the year 1846 the intestate, Robert Irving, otherwise known as Sheridan W. Ford, father of the petitioner, was a slave owned by Miss Brown and living at Portsmouth, Virginia. Julia Ann Gregory, the mother of the petitioner, was also a slave, owned by General John Hodges of Portsmouth, Virginia. Sheridan W. Ford and Julia A. Gregory, with the consent of their owners, went through the form of marriage at the house of General Hodges, owner of Julia Ann, on the corner of North and Middle Streets in said Portsmouth, about the year 1846. General Hodges, in the presence of his own family and witnesses, performed the ceremony, reading from a book, and pronounced them husband and wife. Immediately after this ceremony Julia Ann Gregory and Sheridan W. Ford took up their residence in the basement of General Hodges' house. They lived there together for about eight years as husband and wife, and were so reputed to be in the community. During this union three children were born to said Robert and Julia at General Hodges' house, — George, Robert, and Frank, the petitioner and sole survivor, George and Robert being dead. About the year 1854, some eight years after the marriage of Robert and Julia, Robert, in order to evade an effort of his owner to sell him, escaped from slavery, came to Massachusetts, and changed his name to Sheridan W. Ford. The owner of Julia, fearing that she also would escape and follow her husband, placed her in the jail at Norfolk, Virginia, where she remained five months. She was then sent to Goldsboro, North Carolina, where she remained until 1865, when she returned to Portsmouth, Virginia. Julia did not

hear from Robert until eleven years after their separation. In the mean time Julia married one Killis Bunn, a slave, probably in 1857 or 1858, and after his death she married one Joseph Brown, in the year 1870, at Portsmouth, Virginia. About the time of the escape from slavery of Robert Irving, otherwise known as Sheridan W. Ford, there also escaped from slavery one Clarissa Davis, otherwise known as Mary D. Armstead, the mother of the respondent, who was also a fugitive slave owned at Portsmouth, Virginia. Prior to 1861 the said Sheridan W. Ford and Mary D. Armstead formed a relation in this Commonwealth, there being this evidence of a marriage, to wit, the record of marriage intentions dated November 19, 1856, in the clerk's office in the city of New Bedford in this Commonwealth, of two persons of the name of Sheridan W. Ford and Mary D. Armstead; also a newspaper announcement of a marriage between two persons of the same names on November 20, 1856, and a marriage certificate found after the death of both parties among the effects of Mary D. Armstead. Sheridan W. Ford and Mary D. Armstead lived together as man and wife at Chelsea in this Commonwealth until the death of said Ford on December 22, 1898. Two children were born of this union, Annie Ford and Leonard A. Ford, the respondent, who has been granted letters of administration. In 1865 Sheridan W. Ford wrote to his former wife Julia Ann, and asked her to send his son Robert to him at Chelsea; she sent him, and Robert lived with his father's family in Chelsea for some time. Sheridan W. Ford visited Portsmouth, Virginia, twice after the war of the rebellion, recognized the petitioner Frank Irving as his son, dining with him and his mother and Killis Bunn, her second husband, in 1868, and giving his son Frank clothes and also a gold watch. Frank Irving, the petitioner, visited his father and family in Chelsea, Massachusetts, where he was recognized and treated as a son and brother. Upon Sheridan W. Ford's last visit to Portsmouth, he gave Frank Irving the watch, and said to him: ' Son, I am not coming here any more; it makes me sick in my stomach when I look at the place and see how I had to go away from my wife and children. Here is a watch, take it, it is nothing common, and when I die a part of my property will be yours. You will get your share of it.' "

The statutes and laws of Virginia bearing on the case were admitted in evidence.

The report of the justice concluded as follows : " On the evidence I was of opinion that the marriage in Virginia was not a legal marriage, and that the enabling statutes of Virginia did not apply to it ; that the evidence was sufficient to show a legal marriage between the father and mother of the respondent ; and I find that such a marriage took place. I was therefore of opinion that the decree of the Probate Court should be affirmed."

Such order or decree was to be made as to the court should seem meet.

The statute relied on by the petitioner as accomplishing his legitimation by the acknowledgment of his father was passed February 27, 1866, and was embodied in the Code of Virginia of 1873, Title 30, c. 103, § 4, as follows :

" Where colored persons before the passage of this act shall have undertaken and agreed to occupy the relation to each other of husband and wife, and shall be cohabiting together as such at the time of its passage, whether the rites of marriage shall have been solemnized between them or not, they shall be deemed husband and wife and be entitled to the rights and privileges, and subject to the duties and obligations of that relation in like manner as if they had been duly married by law ; and all their children shall be deemed legitimate, whether born before or after the passage of this act ; and when the parties have ceased to cohabit before the passage of this act in consequence of the death of the woman, or from any other cause, all the children of the woman recognized by the man to be his shall be deemed legitimate."

This statute later was embodied in the Code of Virginia of 1887, § 2227, without substantial change.

*W. H. Lewis & B. W. Wilson,* for the petitioner.

*D. F. Kimball,* for the respondent, submitted the case on a brief.

HOLMES, C. J. This case arises on a petition to the Probate Court to amend the record of a petition for administration by substituting other names as the next of kin, and also to remove the administrator appointed on the earlier petition. The ground of the present proceeding is that the petitioner is the lawful son

of the deceased, and that the respondent, the administrator, is not a lawful son as he alleged. The Probate Court dismissed the petition, and on appeal the case was reported to the full court by a single justice. The facts were these. The petitioner's father and mother were slaves. In 1846, by consent of their owners, they went through a form of marriage in the presence of the master of one of them, and afterwards lived together for eight years, during which time the petitioner was born. In 1854 the father escaped to Massachusetts, and there, in 1856, married another woman, by whom he had a son, the respondent, and a daughter. He lived with this woman until his death in 1898. After the war the petitioner was recognized by the deceased in Virginia as his son.

The petitioner's first contention is that the marriage of his parents in Virginia was valid. This may be disposed of in a few words. It is not argued that the ceremony helped the marriage, but the validity is put on the supposed rule of the common law as to marriage *per verba de præsenti* followed by cohabitation. The single justice found that this so called marriage was void, and we certainly cannot say that he was wrong. In view of this finding upon a question of fact, whatever may be the presumption as to the common law in this country concerning marriages between free persons, we cannot presume that the common law of Virginia gave to such a marriage as we have described between slaves any legal effect. It does not appear what evidence was laid before the single justice, but it may be that his attention was called to *Scott* v. *Raub*, 88 Va. 721, 723. See further, *Hall* v. *United States*, 92 U. S. 27, 30. The statute next to be cited seems to imply that apart from it the parties would not be married. See also the Constitution of Virginia, art. 11, § 9.

The second ground upon which the petitioner seeks to maintain his legitimacy is the Virginia statute passed February 27, 1866, c. 18, § 2 (embodied in the Code of 1873, Title 30, c. 103, § 4; ed. 1887, § 2227). Assuming that the last words of the section would be sufficient to legitimate the petitioner if both he and his father had been domiciled in Virginia after the act was passed, the question is whether they have that effect when the father is domiciled out of the State. They might do so

without bastardizing the Massachusetts children, because legitimation can be brought about without the fact or fiction of a marriage, by a simple fiat. See *Fitchett* v. *Smith*, 78 Va. 524; *McKamie* v. *Baskerville*, 86 Tenn. 459. But the doubt is whether, inasmuch as legitimation deals with a relation, both parties to the relation must not be subject to the power of the Legislature that seeks to affect it before a statute can do so in a way that will be recognized beyond the territorial limit of its power. It might be argued further that both parties did not become subject to the law-making power by the domicil of one and the transitory bodily presence of the other within the State, but that both parties must be domiciled there in order that the power should exist. See *Minor* v. *Jones*, 2 Redf. 289, 298; Minor, Conflict of Laws, § 100; *Blythe* v. *Ayres*, 96 Cal. 532; *Mulhall* v. *Fallon*, 176 Mass. 266.

We shall express no opinion upon the difficulty which we have stated because, although the case was very well argued, this precise point was but slightly touched, and because at this stage a decision of the question is not necessary.

As a decision that the petitioner is a legitimate son of the deceased would not carry with it the consequence that the Massachusetts marriage was void and the children of it illegitimate, it would not follow from such a decision that the petitioner is entitled to administration, supposing him to be competent and suitable within Pub. Sts. c. 130, § 1, cl. 3. St. 1890, c. 265. That consequence would follow only in case it should be held on general grounds that the marriage in this State of a runaway slave before the abolition of slavery was void, if, as we must take it in this case, a marriage in the domicil of his master would have been void.

Notwithstanding the weight of argument and authority to the contrary which will be found summed up in Cobb on Slavery, §§ 227–239, it was the settled doctrine of this State that a slave brought here by his master for even a temporary residence could not be removed from the State against his will. *Commonwealth* v. *Aves*, 18 Pick. 193. *Commonwealth* v. *Taylor*, 3 Met. 72. *Jackson* v. *Phillips*, 14 Allen, 539, 563, 564. In some respects, notwithstanding Article 4, § 2 of the Constitution of the United States, it is easier to recognize a *de facto* freedom

in the case of a runaway slave, — a freedom subject to being ended by legal process, it is true, but still having the consequences of freedom while it lasted. The doctrine of the common law, and, in the case of land, the law of this State, at least until St. 1891, c. 354, was that a disseisor got a title, although by wrong, and left only a right of action to the disseisee. See authorities cited in *Miller* v. *Hyde*, 161 Mass. 472, 480. There is no case to which this doctrine applies with more force than that of the person of a fugitive, in a State which would not have allowed his master to exercise authority here for a week. It is not to be believed that such a person would have been denied the right to maintain the ordinary actions in our courts. *Polydore* v. *Prince*, Ware, 402. In the case of a slave brought here temporarily by his master it well might be argued that his status remained unchanged, although our decisions looked the other way. Cobb, Slavery, § 278. But when he had escaped and had both power and intent to remain in this jurisdiction and out of the master's hands, it would be giving a preponderance to fiction over fact which this Commonwealth would not have tolerated unless under a decision of the Supreme Court of the United States, if he should have been held subject to all the incapacities of a slave. If he could sue, *a fortiori* he could marry. Whatever effect recapture might have upon the relation, we are of opinion, especially in view of the tenderness and doubt that has been felt even as to the marriage of persons living in actual servitude, that the marriage of a fugitive slave in one of the Northern States of this Union was not to be questioned, so long as actual freedom was maintained. *McDowell* v. *Sapp*, 39 Ohio St. 558, 563. *Harris* v. *Cooper*, 31 U. C. Q. B. 182, 197, 200. *Price* v. *Slaughter*, 1 Cincinnati S. C. Rep. 429. 1 Bish. Marr. Div. & Sep. § 669.

It has been held repeatedly that even a marriage of slaves in a slave State might be ratified by continuing cohabitation after they were freed. *Johnson* v. *Johnson*, 45 Mo. 595, 601. *McReynolds* v. *State*, 5 Coldw. 18. 1 Bish. Marr. Div. & Sep. § 665. The conclusion is clearer in a case like the present that a marriage entered into here and continuing after the abolition of slavery is not now to be disturbed.

This is a petition to remove the administrator, not a petition

to revoke the original decree. The petition goes on the single ground that the petitioner is the only legitimate child. We have said enough to show that in our opinion the petitioner has not made out a case for removal on this ground, and we do not mean to intimate that there is ground for revocation. The substantive question whether the petitioner is entitled to share in the distribution of the estate we leave undecided.

*Decree affirmed.*