GRACE SUZANNE HOLLOWAY ET AL. *v.* SAFE
DEPOSIT AND TRUST COMPANY,
TRUSTEE.

*Conflict of Laws—Child Born Out of Wedlock—Legitimation in
Other State—Effect.*

A child which has been legitimated in the state where it and
its father are domiciled has in Maryland the rights of a child
born in lawful wedlock.                                pp. 326-334

The question of who are legitimate children is one of law to be
determined by the law of the domicile of one having the status.
p. 334

The law of comity is a part of the common law of Maryland.
p. 334

There is nothing in the laws or public policy of Maryland to
prohibit giving full effect to the status acquired by a child, born

out of wedlock, through her legitimation under the law of the
state of her father's and her domicile.          pp. 334, 335

A child born out of wedlock, but legitimated according to the
law of her and her father's residence, was a legitimate child for
the purpose of the exercise of a testamentary power in favor of
such father's children.                          p. 336

*Decided July 8th, 1926.*

Appeals from the Circuit Court No. 2 of Baltimore City
(STANTON, J.).

Petition by the Safe Deposit and Trust Company, as trus-
tee under the will of John Q. A. Holloway, deceased, for a
construction of said will, and an adjudication as to the bene-
ficiaries of a fund created thereby. Also bill by said com-
pany as trustee under the will of Susanna Holloway, de-
ceased, asking that the court assume jurisdiction of the trust,
and praying a construction of the will and an adjudication
as to the beneficiaries of the trust. From the decrees rendered
in the two causes, Grace Suzanne Holloway, an infant, by
Marie Calou, her guardian, and Marie Calou, executrix of
John E. Holloway, deceased, appeal. Affirmed in part and
reversed in part.

The causes were argued before BOND, C. J., URNER, AD-
KINS, OFFUTT, DIGGES, PARKE, and WALSH, JJ.

*Charles McHenry Howard* and *Isaac Lobe Straus,* with
whom were *Joseph C. France, Leslie E. Burks* and *J. Paul
Schmidt* on the brief, for the appellants.

*John B. Deming,* for the Safe Deposit and Trust Com-
pany, appellee.

*Edgar Allan Poe,* with whom were *Bartlett, Poe & Clag-
gett* on the brief, for Anna E. Holloway Nones, individually
and as executrix of Edward Lee Holloway, deceased, appellee.

*Robert R. Carman,* submitting on brief, for Anne M. Holloway, appellee.

*Henry H. Dinneen,* submitting on brief, for the Oblate Sisters of Providence, a corporation, appellee.

*Edward P. Keech, Jr.,* submitting on brief, for Clarence J. Holloway, appellee.

ADKINS, J., delivered the opinion of the Court.

John Q. A. Holloway, by his will dated December 23rd, 1903, devised and bequeathed one-sixth of the residue of his estate to the Safe Deposit and Trust Company of Baltimore, in trust to invest the same in such manner as to said trustee shall seem best, and to collect the income from time to time arising from the investment so to be made by it, and to pay over the net income to his son John E. Holloway, "so long as he shall live, and at the death of my said son John E. Holloway, in trust to divide the corpus or principal of the property and estate so theretofore held in trust for him among his children and descendants in such portions as my said son shall by last will and testament direct or appoint, but if my said son shall die without having exercised such power of testamentary appointment, then at his death said trustees shall divide the same in equal portions among the children of my said son John E. Holloway, if any he shall have then living, and the then living issue of any child of his who may then be dead, such issue to represent its or their parent in the distribution, and to take only the share or portion to which the parent if then living would be entitled. But if my said son John E. Holloway shall die without leaving children or descendants him surviving, then and in that event, the said trustee shall at his death pay over and deliver absolutely one-third of the corpus or principal of said trust fund and property to my son Edward Lee Holloway, free and clear of all trust, and shall continue to hold the remaining two-thirds thereof in trust in equal shares for my daugh-

ter Anna Elizabeth Holloway and my son Clarence J. Holloway, in accordance in all respects" with the terms of trusts created for them in other paragraphs of the will. "With the proviso, however, that in any event if my said son John E. Holloway shall leave a widow him surviving and born in my life time, the trustee shall at his death retain for division at her death or remarriage, whichever shall first occur, one hundred thousand dollars of the trust fund and property, and shall only during her life or widowhood, pay over to her at regular stated periods the income arising from said sum of one hundred thousand dollars, which principal sum it shall divide as hereinbefore provided at the death or remarriage of such widow."

Susanna Holloway, wife of John Q. A. Holloway, by her will dated March 20th, 1907, devised and bequeathed to said trustee in trust for her son the said John E. Holloway, for life, one-fourth of the residue of her estate in the same language and with the same remainder as to children and descendants as in the will of her husband, but providing that in case of failure of children or descendants surviving, the trustee should pay over absolutely to her son Edward L. Holloway one-sixth part of the trust fund, and continue to hold in trust for her daughter Anna Elizabeth Holloway and her son Clarence J. Holloway, each one-sixth part, the remaining three-sixths parts to be paid over to certain religious associations named as defendants in the bill filed by the trustee. There are three codicils to this will, the last dated October 20th, 1911.

John Q. A. Holloway died in January, 1904, and Susanna Holloway in December, 1911.

John E. Holloway, at the time these wills were executed, was living with his wife, Anne McClellan Holloway, whom he married in June, 1899. They lived in Baltimore several years, in New York five or six years, travelled considerably, visited Biarritz, France, several times, and settled there in 1905 or 1906, and continued to live together there until the 5th day of May, 1911, when they formally separated,

having executed an agreement of separation. There were no children born to them. She survived him and they were never divorced. In Biarritz he became acquainted with a little girl named Marie Calou, then about twelve years old, to whom he became very much attached. Subsequently Mr. and Mrs. Holloway took an apartment in the house where this girl lived with her grand-parents. When she was about eighteen, in 1908, the illicit intercourse between them began. In the early part of 1912, after the death of his mother, they came to Baltimore, where Miss Calou was ill for several months and in July, 1912, they went to Reno, Nevada, with the intention of making that their home, and there Grace Suzanne Holloway was born in September, 1912, as the result of this illicit intercourse. Her father promptly made out and filed in the department of vital statistics of that city a birth certificate, giving the name of the child as above, and acknowledging her to be his child. They continued to live as a family in Reno for several years, during which time she was publicly acknowledged by him to be, and generally recognized as, his child.

While living in Nevada John E. Holloway endeavored to obtain a divorce from his wife in order that he might marry Miss Calou, but failed. After about three years residence in Reno, he moved with Miss Calou and Suzanne to California, where they lived as a family until his death in 1925. There also he held out Suzanne as his child, and was in every way an affectionate father. It is contended by appellant that there, too, he complied with the legitimation statute. We shall not stop to discuss the arguments *pro* and *con* on this point, as it would add nothing to the strength of appellant's case to hold that legitimation was accomplished a second time, if it had been effected in another state.

On the 24th day of March, 1913, John E. Holloway made a will in which he executed the powers of appointment under the wills of his father and mother in favor of "my beloved daughter, Grace Suzanne Holloway, born to me and

Marie Calou, at the city of Reno, County of Washoe, State of Nevada, upon the 23rd day of September, A. D. 1912"; and appointed Marie Calou as executrix. He left no child or descendant other that Grace Suzanne.

On being advised of the death of Holloway, and of his will, the trustee filed a petition in Circuit Court No. 2 of Baltimore City, which had taken jurisdiction of the trust under John Q. A. Holloway's will, asking for a construction of the language of said will, "in so far as construction may be necessary for the determination of the rights of all parties who may be entitled thereunder"; and that the court determine for whose benefit said share "is now held and/or distributable in view of the death of the said John E. Holloway, leaving a will as. aforesaid." And on the same day the trustee filed a bill of complaint against all the parties who were or might be interested under the wills of Mrs. Susanna Holloway and John E. Holloway, asking the court to take jurisdiction over the further administration of the trusts created by Mrs. Susanna Holloway, and for the construction of that will so far as may be necessary for a determination of the rights of all parties who may be entitled thereunder. The cases proceeded to submission for decrees, when the learned chancellor decreed, in effect, in the cases respectively, that John E. Holloway died without a child or descendant within the meaning of the wills of his father and mother; that the powers of appointment had not been validly exercised by him; and that the part of the corpus of the two estates which had been held for his benefit passed to those who were to take under said wills on the happening of the contingency of his death without children or descendants. From those decrees these appeals were taken and by agreement of counsel were brought up in one record.

Revised Laws, 5833, of the State of Nevada provides:

"Sec. 9. The father of an illegitimate child, by publicly acknowledging it as his own, or receiving it as such, with the consent of his wife, if he is married,

into his family, or otherwise treating it as his legiti-
mate child, thereby adopts it as such; and such child
shall thereupon and thenceforth, be deemed, for all
purposes, legitimate from the time of its birth. * * *"

It is strongly urged by appellees that as said section 9
is an integral part of the Nevada laws passed to provide for
the adoption of children, it cannot be regarded as a legiti-
mating statute, and should not be given the effect that such
a statute would have.   But adoption and legitimation are
every where recognized as two different things.   Unques-
tionably the section referred to provides that an illegitimate
child adopted as provided by that section "shall thereupon
and thenceforth, be deemed for all purposes, legitimate from
the time of its birth."   And it further provides that the
provisions of the foregoing sections of the act do not apply
to such an adoption, except as specified in section 4; and
section 4 provides that an illegitimate child cannot be
adopted without the consent of its mother, nor without its
own consent in writing, if over the age of twelve years.
This section is clearly, therefore, separated from the other
sections which apply to the adoption of children of other
parents, and it is made plain that the intention of the act
is to fully legitimate a child adopted under section 9.   There
is no analogy between this section and the adoption statute
in Maryland.

It was proved by competent witnesses that under the
construction of this statute by the courts of Nevada, a com-
pliance with any one of the alternative provisions of the
statute was sufficient to legitimate a child born out of wed-
lock, and this opinion is supported by *In re Estate of
Parrott,* 45 Nev. 318.

It is practically conceded that "children" as used in the
wills of John Q. Holloway and Susanna Holloway means
legitimate children.

But the contention of appellants is that the legitimation
of Grace Suzanne Holloway in Nevada gave her the status
of a legitimate daughter of John E. Holloway, which as a

matter of comity should be recognized everywhere, and which gave her all the rights that a child born to her father in lawful wedlock would have (1) to inherit and take as heir and next of kin from and through him; (2) to take under a will in the capacity of a "child" or "descendant" of her father. Counsel for appellants cite in support of this contention many cases both in England and in this country, including *In re Goodman's Trusts,* 17 Ch. Div. 266; *In re Andros,* 24 Ch. Div. 637; *In re Grey's Trusts,* 3 Ch. Div. 88; *Shottowe v. Young,* 11 L. R. Eq. Cas. 474; *In re Ferguson's Will,* 1 Ch. Div. 483; *Ross v. Ross,* 129 Mass. 243; *Green v. Kelley,* 228 Mass. 602; *Irving v. Ford,* 179 Mass. 216; *Irving v. Ford,* 183 Mass. 448; *Moore v. Saxton,* 90 Conn. 164; *Miller v. Miller,* 91 N. Y. 321; *Dayton v. Adkisson,* 45 N. J. Eq. 603; *Fowler v. Fowler,* 131 N. C. 169; *Bennett v. Toler,* 15 Grat. (Va.) 588; *In re Oliver's Estate,* 184 Pa. St. 306; *Smith v. Kelley,* 23 Miss. 167; *Caballerro's Succession,* 24 La. Ann. 573; *McNamara v. McNamara,* 303 Ill. 200.

The case of *Birtwhistle v. Vardill,* 5 B. & Cr. 438, established the principle that legitimation in another country did not entitle the one so legitimated to inherit land in England; but as to personal property gave such a one all the rights of a child born in lawful wedlock; and in *Re Grey's Trusts, supra,* it was held that even in England the exception as to real estate did not apply to a devise, but that a legitimated child would take real as well as personal property under the description of "child" in a will.

In this country, by the great weight of authority, when a child has been legitimated in the state where it and its father are domiciled, it will be held in other states to have the rights of a child born in lawful wedlock, both as to inheritance, and as to taking under a deed or will under the description of "child" or "descendant." The learned and able counsel for appellees have not referred us to a single case holding otherwise, unless the cases in Maryland about to be considered so hold. But they strenuously con-

tend, and with a good deal of force, that in *Barnum v. Barnum,* 42 Md. 251; *Jackson v. Jackson,* 82 Md. 17, and *Harding v. Schapiro,* 120 Md. 541, Maryland has taken a position in conflict with that held practically everywhere else. A careful analyses of these cases, however, we think, will show that this conflict is apparent rather than real.

In *Barnum v. Barnum, supra,* the question, so far as it relates to this case, was whether John R. Barnum could take personal property as a child or descendant of his father Richard Barnum, under that description in the will of David Barnum the father of Richard. It was claimed on behalf of John R. that he had been legitimated by the marriage of his father and mother in Arkansas after his birth, but the Court found as a fact that there was no such marriage. It was further claimed that even if there was no such marriage, yet, by the operation of an Act of the Legislature of Arkansas, John R. Barnum was rendered legitimate, as if a valid marriage had taken place, and was therefore capable of taking whatever right that would or could devolve on any legitimate child of his father; that the act was retroactive, and related back to the time of the birth of the child declared to be heir. The act provided "that John Rockwell Barnum be and is hereby constituted a legal heir of Richard Barnum"; "that all laws or parts of laws inconsistent with this act be and the same is hereby repealed"; "that this act be in force from and after its passage."

The act was passed in 1852, eight years after the death of the testator, and by its terms did not go into effect until after its passage. The underlying idea of the Court in holding that the act could have no extra territorial operation may have been with reference only to the question directly in issue (the legitimacy of the claimant) and, in that connection, based on the ground that it went into effect after the death of the testator and could not have been contemplated by him at the time his will went into effect. Or, if the Court contemplated any wider reference, it may have been based on the character of the act itself, in that it was

a special arbitrary act, at variance with the general legitimation law of the State of Arkansas, which provided for subsequent marriage and recognition as requirements for legitimation, the act making "no reference to any marriage, and in no sense could operate to confirm any defective or imperfect marriage. Its operation does not even depend upon the fact that John R. Barnum was the child of Richard Barnum. It simply, by force of the law itself, and not of the circumstances of birth or relationship, gave to John R. Barnum a personal status, with capacity to inherit from Richard Barnum as heir."

What was said in the words quoted would have been decisive of the question in issue, because a legislative act merely making a child the heir of its father, without reference to relationship, would not be held to legitimate him and give him the status of a child born in lawful wedlock, with capacity to inherit or take from one not its parent, in the capacity of a child of such parent. And when the Court proceeded to say: "But as to the capacity to acquire property beyond the state passing the act, by virtue of the particular status given the party, that the Legislature could not confer. Even if the act had professed to legitimate John R. Barnum, without reference to previous marriage, it could have no operation here, and no rights involved in this case could be affected by it," it may still have been referring only to the effect of an arbitrary and special act in conflict with the general law of the state whose legislature passed the act. The Court clearly did not mean to declare the law of Maryland in the matter of status different from that of the rest of the civilized world; for it bases its statement last quoted "on reason and authority," and cites as authorities relied on, 5 *Com. Dig. Parliament* (K), p. 301; *Birtwhistle v. Vardill,* 5 B. & Cr. 438; *Houlditch v. Donegall,* 2 Clark & Fin. 476; *Smith v. Derr's Admrs.,* 34 Penn. St. 126; *Story's Conflict of Laws,* secs. 87, 87A.

None of these authorities support the general proposition, that the status of a child, legitimated by the laws of its and

its father's domicile, will not be recognized in other jurisdictions having different requirements, and that such a legitimated child cannot take personal property, either as next of kin or under the description of "child" in a will. *Birtwhistle v. Vardill, supra,* and *Story's Conflict of Laws,* assert a directly contrary doctrine. ·

If, therefore, anything said in *Barnum v. Barnum, supra,* tends to support the proposition that in Maryland such a status will not be recognized, merely because the method of legitimation provided by the general legitimation statute of the state where the status is acquired is different from that provided by the legitimation statute of Maryland, we hold such statement to be *obiter dictum* and not binding as a precedent.

In *Jackson v. Jackson,* 82 Md. 17, the question was whether the appellee was the legitimate daughter of her father, whose estate was being administered. She was the daughter by a marriage in Pennsylvania without a religious ceremony, such a ceremony not being required there, and it was argued that the legitimacy of appellee, who was born in Pennsylvania, where her parents then lived, must be determined, not by the laws of that state, but by the law of Maryland. And the case of *Birtwhistle v. Vardill,* 5 B. & Cr. 438, was cited to support that view. What the Court said about that case was merely an exposition of the English doctrine as declared in that case, that the law of another state legitimating a child born out of lawful wedlock could not give it an inheritable status as to real estate in England. The case itself does not go any further, but distinctly recognizes that the doctrine it announces does not apply to personal property. It cannot be supposed that this Court meant to go beyond that, even if it intended to adopt that decision as applicable to real estate in Maryland.

When the opinion says that a local statute which makes an illegitimate child, or a child born out of wedlock, legitimate upon certain prescribed conditions, such as the subsequent marriage of the parents and the recognition of the child

as theirs, can have no extraterritorial operation, and therefore cannot give to such a child in another jurisdiction an inheritable status not accorded to it by the law of the latter "jurisdiction," it must be read as if "as to real estate" followed the word "operation," for that is what the case Judge McSherry was discussing dealt with; and "inheritable status" applies to real estate. Judge McSherry certainly knew that the statement quoted would not be a correct statement of principle generally recognized, if applied to personal property, and he must have known that, as to personal property, it was not the principle announced in the case he was discussing.

The case of *Harding v. Schapiro,* 120 Md. 541, is more difficult to reconcile with the contention of appellants. In that case the Court held that the determination of the question of the "majority" of a legatee who resided in Austria, where the time of reaching majority was different from that in Maryland, "does not require the application of the rules of private international law, because it is not governed by these rules." And it held that the general rule must be applied that wills of personalty must be construed with reference to the law of a testator's domicile at the time of his death, unless it appears on the face of the will that it could be construed with reference to some other law, quoting from Justice Story in *Harrison v. Nixon,* 9 Pet. (34 U. S.) 483: "The language of wills is not of universal interpretation, having the same precise import in all countries, and under all circumstances. They are supposed to speak the sense of the testator, according to the received laws or usages of the country where his domicile is, by a sort of tacit reference; unless there is something in the language which repels or controls such a conclusion. In regard to personalty, in an especial manner, the law of the place of the testator's domicile governs in the distribution thereof, and will govern in the interpretation of wills thereof; unless it is manifest that the testator had the laws of some other country in his own view."

However, Judge Burke, who wrote the opinion, recognized the principle announced by Justice Gray in *Ross v. Ross, supra,* as "generally approved by the courts of this country," viz: "The status or condition of any person, with inherent capacity of succession or inheritance, is to be ascertained by the law of his domicile which creates the status, at least when the status is one which may exist under the laws of the state in which it is called in question, and when there is nothing in those laws to prohibit giving full effect to the status and capacity acquired in the state of domicile." And Judge Burke added: "Speaking generally, it may be said that the capacity of the donee to take is governed by the law of the domicile." Now, the natural conclusion to be drawn from *all* that was said by Judge Burke is that the Court did not regard the question of the majority of the legatee in that case as one of status at all. She was a niece of the testatrix, *in esse* at the time the will was made, and dealt with as an individual and not as the child of some one else. The testatrix wanted *her* to have the legacy at a given time, viz: when she should arrive at the age of eighteen years, the age of the "majority" of a girl, as testatrix knew it. She was not providing for some unborn person who might answer the description of "child" of another at some future time. This seems to explain the statement: "The case does not require the application of the rules of private international law; because it is not governed by these rules." It was simply a question of finding the intention of the testatrix, and in the case then before the Court that intention could be found without considering the principle applicable to status.

In the present case the testators were bequeathing remainders to unborn children, whom they would probably never know, of a son living out of the country. That is, they were providing for persons not then in being and in whom the testators could have no interest except as they might answer the description of a class, the members of which should have in their veins testators' blood. That condition being gratified, they must further be "children" of their father accord-

ing to the law of the State of Maryland, that is, "legitimate" children. That, as said by Justice Kay in *Andros v. Andros, supra,* is as far as construction can go. The question of who are legitimate children is one of law to be determined by the law of the domicile of one having the status. The application of the principle, quoted by Judge Burke from *Harrison v. Nixon, supra,* eliminated the question of status in the case he was deciding; but it would be contrary to the other principle there recognized to hold that, where the question of status is involved, the rules of private international law may be disregarded. Why should they be any more disregarded where the question is one of legitimacy than where the question is as to the validity of a marriage? The rule that a marriage, if valid where solemnized, is valid everywhere, is hardly more generally recognized than the rule approved in *Harding v. Schapiro,* that "the status or condition of any person, with inherent capacity of succession of inheritance, is to be ascertained by the law of his domicile which creates the status, at least when the status is one which may exist under the laws of the state in which it is called in question, and when there is nothing in those laws to prohibit giving full effect to the status and capacity acquired in the state of domicile."

The law of comity is a part of the common law of this state. *Balto. & Ohio R. Co. v. Glenn,* 28 Md. 287. This brings us to the question: Is there anything in our laws or in the public policy of this State to prohibit giving full effect to the status acquired by Grace Suzanne Holloway in Nevada; or is such status so repugnant to good morals as to make its recognition improper? The same answer may be given to this question as was given by Chief Justice Rugg in *Green v. Kelley, supra:*

"Removal of obstacles to the legitimation of innocent children, who have no responsibility for the circumstances of their birth, and thus ameliorating some of the apparent harshness of the common law, has been the progressive policy of our law as illustrated by statutes and decisions. * * * It is

not contrary either to our statute law or the public policy of this commonwealth that the children of a marriage, bigamous on the part of one parent, but innocent on the part of the other, should be declared legitimate to some extent and under some circumstances.  There is no express prohibition of such recognition in our statutes.  There is no intimation of the inhibition of such recognition in any of our decisions."

In that case children born of a bigamous marriage, who were legitimate under a statute in Indiana, were held entitled to share as "lineal descendants" of the grandfather of the testatrix.  See also *Moore v. Saxton,* 90 Conn. 164; *McNamara v. McNamara,* 303 Ill. 191.

In this connection it is worthy of note that more than half of the states of this country have provided by statute for the legitimation of children born out of wedlock without the subsequent marriage of their parents, although in most of them the right of inheritance is limited.  We do not agree with the contention of appellees that Code, art. 46, sec. 6, is an "inheritance statute" and nothing more; nor in the contention that it confers only the right to inherit from the father.  The language of the statute is that children legitimated by the marriage of their parents and the acknowledgment of their father shall, in virtue of such marriage and acknowledgment "be hereby *legitimated* and capable in law to inherit and transmit inheritance *as if born in wedlock.*"

There is nothing in *Scott v. Independent Ice Co.,* 135 Md. 343, cited by appellees, to support this contention.  There the question was whether the word "child" in the Workmen's Compensation Law included an illegitimate child of the father, and the Court held it did not; that the right to inherit from the father was not given until the passage of the act referred to.  There was nothing said there to indicate that by that act the child so legitimated could inherit only from the father.

That it is not the policy of this State to punish children for the sins of their parents has been decided in several

336 HOLLOWAY *v.* SAFE DEP. & TR. CO.

Opinion of the Court. [151

cases.   See *Hawbecker v. Hawbecker,* 43 Md. 517; *Brewer v. Blougher,* 14 Pet. (U. S.) 178; *Dilworth v. Dilworth,* 134 Md. 589.

Our conclusion is that the will of John E. Holloway, deceased, whereby he appointed the infant defendant, Grace Suzanne Holloway, the devisee in remainder of the properties to which he was given limited powers of appointment by the wills of John Q. A. Holloway, deceased, and Susanna Holloway, respectively, was a valid exercise of the said powers of appointment, and that the decrees appealed from must be reversed in so far as they decide to the contrary; and that said decrees in other respects must be affirmed.

> *Decree in No. 47 affirmed in part and reversed in part, and cause remanded that a decree may be passed in accordance with this opinion, costs to be paid out of the corpus of the trust funds in controversy therein.*

> *Decree in No. 48 affirmed in part and reversed in part, and cause remanded that a decree may be passed in accordance with this opinion, costs to be paid out of the corpus of the trust funds in controversy therein.*

BOND, C. J., URNER and PARKE, JJ., dissent.